TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
SARAH E. SPIELBERGER (Cal. Bar No. 311175)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3358
    Facsimile: (213) 894-0141
    E-mail:    sarah.spielberger@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>APPROXIMATELY 27,677,596.29 USDT,<br><br>       Defendant. | Case No. 2:26-cv-00891<br><br><u>VERIFIED COMPLAINT FOR FORFEITURE</u><br><br>18 U.S.C. § 981(a)(1)(A) and (C) |

The United States of America brings this claim against the defendant identified herein (the "Defendant Asset"), and alleges as follows:[1]

---

[1] All dates set forth in this Complaint are on or about the dates indicated, and all amounts or sums are approximate.

**JURISDICTION AND VENUE**

1. Plaintiff United States of America brings this <u>in rem</u> forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this District pursuant to 28 U.S.C. §§ 1355 and 1395.

**PERSONS AND ENTITIES**

4. The plaintiff is the United States of America (the "plaintiff" or the "government").

5. The Defendant Asset consists of 27,677,596.29 USDT, which is also known as Tether and is a "stablecoin" type of virtual currency whose value is pegged to the U.S. dollar as discussed below. More specifically, the Defendant Asset consists of the USDT transferred to the government following the issuance of a federal seizure warrant on September 11, 2025, containing an equivalent amount of UDST, less transaction fees, frozen by the government on April 17, 2025, and associated with the virtual currency addresses (collectively, the "Virtual Currency Wallets") on the Tether network listed below:

  a. 7,100,000 USDT associated with a virtual currency address ending in 5vWr8 ("Virtual Currency Wallet 1");

  b. 10,000,001 USDT associated with a virtual currency address ending in 2PmK7 ("Virtual Currency Wallet 2");

  c. 10,000,001.16 USDT associated with a virtual currency address ending in syMFh ("Virtual Currency Wallet 3");

  d. 288,951.55 USDT associated with a virtual currency address ending in r17Ve ("Virtual Currency Wallet 4"); and

   e. 288,642.58 USDT associated with a virtual currency address ending in JkeNB ("Virtual Currency Wallet 5").

6. The Defendant Asset was seized pursuant to a federal seizure warrant on September 11, 2025, by the Federal Bureau of Investigation ("FBI") at 11000 Wilshire Boulevard, Suite 1700 in Los Angeles, California.

7. The Defendant Asset is held in the custody of the United States Marshals Service, where the Defendant Asset shall remain subject to this Court's jurisdiction pending the resolution of this action.

8. The interests of the victim, a company with an office in Los Angeles, California, ("Company 1"), may be adversely affected by these proceedings.

**BASIS FOR FORFEITURE**

**I. Summary Of This Action**

9. In March 2025, an individual pretending to be an employee of Company 1 fraudulently induced another Company 1 employee based in Los Angeles, California, to wire approximately $48 million of Company 1 funds to third party bank accounts.

10. Then, over a series of at least 50 transactions, the bulk of these funds were transferred to virtual currency addresses, converted into USDT, transferred into other virtual currency addresses, and then transferred into the Virtual Currency Wallets.

11. The Defendant Asset is the traceable proceeds of this scheme, and was also involved in money laundering, and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

12. Before discussing the factual details concerning the scheme, a brief discussion of relevant Virtual Currency terms is in order.

## II. Definitions and Background Related to Virtual Currency

13. "Cryptocurrency," a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Ether, Solana, and Litecoin. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.

14. Cryptocurrencies operate on a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction. Examples of blockchains are the Bitcoin blockchain, Ethereum blockchain, and Solana blockchain.

15. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to

send and receive cryptocurrency.  A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key").  A public address is represented as a case-sensitive string of letters and numbers, 26–35 characters long.  Each public address is controlled and accessed through the use of a unique corresponding private key — the cryptographic equivalent of a password or PIN — needed to access the address.  Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

16. Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar.  Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

17. Payward, Inc., commonly known as Kraken ("Kraken"), is a company that manages an online cryptocurrency exchange.

18. Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for Tether tokens ("USDT").

## III. The FBI Investigation

### A. An Individual Impersonated Company 1's CEO and Fraudulently Induced a Company 1 Employee to Transfer Company 1 Funds into Third-Party Bank Accounts

19. On March 27, 2025, a Company 1 employee ("Employee 1") received a text message on her Company 1-issued cellphone from an individual claiming to be another Company 1 employee ("Employee 2"). Employee 1 works in Company 1's Los Angeles office. After eventually speaking with the individual on the phone, Employee 1 believed that he was really Employee 2.

20. The individual initially texted Employee 1: "Hi [Employee 1], it's [Employee 2]…I hope you are well…We are currently working on a confidential acquisition and we will need your assistance. Please get back to me when you see my message so we can schedule a call".

21. The individual posing as Employee 2 also informed Employee 1 that he needed her to work on a confidential merger and acquisition deal that would exist outside of the normal approval structure. Eventually, he created a text group chat with himself, Employee 1, and a third individual who claimed to be an attorney ("Attorney 1"). Both individuals knew information about Company 1 that was not readily publicly available, such as which banks the company utilized.

22. Over the next several days, the impersonators posing as Employee 2 and Attorney 1 asked Employee 1 to complete several tasks to allow her to create wire payments in Company 1's Citibank internet portal to be approved by her superiors and paid. The impersonators led Employee 1 to believe that she needed to circumvent the normal checks and balances of the payment creation process due to the sensitive nature of the project. Employee 1 coordinated with various individuals and offices at Company 1 to obtain the proper access to

6

create payments and was then instructed by the imposters to begin creating payments over the next several days. Employee 1 also received documents via Docusign software that listed the purpose of the project and constrained her from speaking openly about it.

23. During the first two weeks of April 2025, at the imposters' instructions, Employee 1 caused Citibank to transfer numerous payments ranging from $100,000 to about $1,000,000 from Company 1's Citibank account.

### B. The Defendant Asset is the Traceable Proceeds of the Scheme and was Involved in Money Laundering

#### 1. Company 1 Funds were Transferred into Pooling Wallets

24. From April 7 to April 16, 2025, in a series of several transfers, $20,105,459 was sent from a Company 1 bank account with Citibank ending in 0033 ("Citibank 0033") to an account at Citibank held by "J AND D Funding." Company 1 has never had business with any company named J AND D Funding and did not authorize these transfers.

25. Between April 7 and April 16, 2025, in a series of 25 transfers, $19,884,505 was transferred from that Citibank J AND D Funding account to a Kraken wallet ending in DGwTP ("Pooling Wallet 1")[2].

26. From April 2, 2025, to April 16, 2025, in a series of several transactions, an additional $24,190,924 was transferred from Citibank 0033 directly to Pooling Wallet 1. Company 1 did not authorize these transfers.

---

[2] Individuals laundering cryptocurrency often using "pooling accounts" to combine and temporarily house criminal proceeds sourced from several locations. By combining funds in this manner, launderers are better able to conceal the nature, source, location, ownership, or control of their proceeds.

7

27. Between April 7 and April 16, 2025, in a series of 39 transactions, nearly all of the $44,075,429 of Company 1 funds (less transaction fees) were converted within Pooling Wallet 1 from fiat currency into USDT on the Tron blockchain using Kraken exchange services. Specifically, from April 7 to April 16, 2025, fiat currency was used to acquire a total of 43,685,825.13 USDT.

28. From April 7 to April 16, 2025, in a series of 68 transactions, 43,685,415 USDT of these funds were subsequently forwarded to an unhosted wallet[3] ending in DGwTP ("Pooling Wallet 2").

29. As detailed below, from Pooling Wallet 2, 43,509,521 USDT was transferred to various other unhosted pooling wallets and then ultimately to the Virtual Cryptocurrency Wallets.

### 2. Virtual Currency Wallet 1

30. Between April 15 and April 16, 2025, in a series of six transfers, Pooling Wallet 2 transferred 11,000,000 USDT to an unhosted wallet ending in 4B23v ("Pooling Wallet 3").

31. On April 18, 2025, in a series of three transfers, Pooling Wallet 3 transferred 7,100,000 USDT to Virtual Currency Wallet 1, which the government has seized pursuant to the federal seizure warrant.

---

[3] An unhosted wallet is a cryptocurrency wallet that is not held or managed by a cryptocurrency exchange or business. Cryptocurrency money launderers often use unhosted wallets because they are not subject to the regulations and oversight of a cryptocurrency exchange.

8

### 3. Virtual Currency Wallet 2

32. From April 9 to April 14, 2025, in a series of eight transfers, Pooling Wallet 2 transferred 8,242,000 USDT to an unhosted wallet ending in 82ci4 ("Pooling Wallet 4").

33. On April 9, 2025, Virtual Currency Wallet 4 sent 1,758,000 USDT to Pooling Wallet 4, which were fraudulently obtained Company 1 funds.

34. On April 17, 2025, Pooling Wallet 4 transferred 10,000,001 USDT to Virtual Currency Wallet 2, which the government has seized pursuant to the federal seizure warrant.

### 4. Virtual Currency Wallet 3

35. Between April 13 and 14, 2025, Pooling Wallet 2 transferred 11,400,000 USDT to an unhosted wallet ending in 8hsDF ("Pooling Wallet 5").

36. Between April 17 and April 18, 2025, Pooling Wallet 5 sent 10,000,001.16 USDT to Virtual Currency Wallet 3, which the government has seized pursuant to the federal seizure warrant.

### 5. Virtual Currency Wallet 4

37. Between April 7 and April 18, 2025, Pooling Wallet 2 transferred 12,867,521 USDT to Virtual Currency Wallet 4.

38. On April 9, 2025, Virtual Currency Wallet 4 sent 1,758,000 USDT to Pooling Wallet 4.

39. On April 15, 2025, Virtual Currency Wallet 4 also sent 2,500,000 USDT to Pooling Wallet 3.

40. On April 16 and April 17, 2025, in a series of four transfers, Pooling Wallet 3 sent 6,400,000 USDT back to Virtual Currency Wallet 4.[4]

41. On April 14, 2025, Pooling Wallet 5 sent 1,400,000 USDT to Virtual Currency Wallet 4. The 1,400,000 USDT originated from fraudulently obtained Company 1 funds.

42. Between March 30 and April 17, 2025, Virtual Currency Wallet 4 transferred 1,548,424 USDT to Virtual Currency Wallet 4, 288,951.55 USDT of which the government has seized pursuant to the federal seizure warrant.

      6. Virtual Currency Wallet 5

43. Between March 30 and April 17, 2025, Virtual Currency Wallet 4 transferred 1,548,424 USDT to Virtual Currency Wallet 5, 288,642.58 USDT of which the government has seized pursuant to the federal seizure warrant.

44. The transfers described above are consistent with cryptocurrency money laundering in that they employ common laundering techniques like "chain hopping", meaning transferring fraud proceeds from one cryptocurrency exchange to another, and making many transactions in short succession. In employing these techniques, cryptocurrency money launderers are better able to conceal the nature, source, location, ownership, or control of the proceeds.

**FIRST CLAIM FOR RELIEF**

45. Based on the facts set out above, the government alleges that the Defendant Asset constitutes property involved in

---

[4] These circuitous transfers are consistent with cryptocurrency money laundering — by moving funds in this fashion, cryptocurrency money launderers aim to conceal the true nature, source, location, ownership, or control of the proceeds.

10

transactions or attempted transactions in violation of 18 U.S.C. § 1956, or property traceable to such property, with the specified unlawful activity being violations of 18 U.S.C. § 1343 (wire fraud). The Defendant Asset is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

**SECOND CLAIM FOR RELIEF**

46. Based on the facts set out above, the government alleges that the Defendant Asset constitutes property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or property traceable to such property, with the specified unlawful activity being violations of 18 U.S.C. § 1343 (wire fraud). The Defendant Asset is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

**THIRD CLAIM FOR RELIEF**

47. Based on the facts set out above, the government alleges that the Defendant Asset constitutes or is derived from proceeds traceable to, or a conspiracy to commit violations of 18 U.S.C. § 1343 (wire fraud), which is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B). The Defendant Asset is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the Defendant Asset;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the Defendant Asset to the United States of America for disposition according to law; and

1      (d)  for such other and further relief as this Court may deem
2  just and proper, together with the costs and disbursements of this
3  action.

4

5  Dated: January 28, 2026    TODD BLANCHE
    Deputy Attorney General
6      BILAL A. ESSAYLI
    First Assistant United States Attorney
7      ALEXANDER B. SCHWAB
    Assistant United States Attorney
8      Acting Chief, Criminal Division
    JONATHAN S. GALATZAN
9      Assistant United States Attorney
    Chief, Asset Forfeiture Section
10

11     *Sarah E. Spielberger*
    SARAH E. SPIELBERGER
12     Assistant United States Attorney

13     Attorneys for Plaintiff
    UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFICATION

I, Austin Anderson, hereby declare that:

1. I am a Special Agent of the United States Secret Service and the case agent for the forfeiture matter entitled *United States of America v. 27,677,596.29 USDT*.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 28, 2026 in Los Angeles California.

_____
Austin Anderson
Special Agent
Federal Bureau of Investigation